IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| MICHAEL A. BRYNER, | ) |  |
|---|---|---|
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) | Civil Action No. 3:12CV103–HEH |
|  | ) |  |
| E.I. DUPONT DE NEMOURS & COMPANY, | ) ) ) |  |
|  | ) |  |
| Defendant. | ) |  |

## MEMORANDUM OPINION
(Cross Motions for Summary Judgment)

Michael A. Bryner ("Bryner") brought this action against his employer, E.I. du Pont de Nemours & Company ("DuPont"), under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461, challenging its denial of accidental death benefits. Bryner's claim arose from his wife's death while under the care of her treating physician. The dispute turns on the definition of a "covered accident." The parties have filed cross motions for summary judgment, which have been thoroughly briefed, and the Court has entertained oral argument. For the reasons that follow, the Court agrees that DuPont's decision must be reviewed under the deferential "abuse of discretion" standard. However, DuPont's analysis of the claim does not employ a reasonable definition of the term "accident," and consequently it has abused its discretion in denying Bryner's claim. Accordingly, the Court will grant Bryner's Motion for Summary Judgment and deny DuPont's Motion for Summary Judgment.

# I. BACKGROUND[1]

Bryner and his spouse, Lorraine Bryner ("Mrs. Bryner"), were covered by DuPont's "Beneflex Accidental Death Insurance Plan" (the "Plan"). (PRU at 20-31.) Under the Plan terms, their lives were insured for any loss "directly related to the injuries from [an] accident." (DUP at 174.) Further, the Plan excluded any death resulting from "sickness, disease or bodily infirmity except when a direct result of a covered accident." (*Id.*) However, conspicuously absent from the Plan is any definition of a "covered accident." Although Prudential is the insurer obligated to pay claims under the plan, DuPont serves as the "Plan Administrator" vested with "the discretionary right to determine eligibility for benefits . . . and to construe the terms and conditions of [the] Plan." (*Id.* at 194.) Prudential makes initial decisions on claims and reconsideration requests, but DuPont ultimately has full authority to review those decisions. (*Id.* at 175-76.)

For several years, Mrs. Bryner suffered from a number of medical conditions, including gout and renal disease, the latter of which led to a kidney transplant after numerous hospitalizations. (PRU at 211-225.) To treat her non-fatal gout, Mrs. Bryner's physicians prescribed a standard dose of twice-daily colchicine, which she was instructed

---

[1] Pursuant to E.D. Va. Loc. R. 7(C)(2), DuPont has filed the entire administrative record under seal. (ECF Nos. 20, 21.) Bryner has not objected to the admissibility of any part of the record, so the Court accepts the record as undisputed. *See* Fed. R. Civ. P. 56(e)(2) ("If a party fails to . . . properly address another party's assertion of fact, . . . the court may . . . consider the fact undisputed for purposes of the motion"). The record is divided into a portion from Prudential Insurance Company of America ("Prudential"), designated as "PRU," and a portion from DuPont, designated as "DUP." The Court will cite the record as "PRU at __" and "DUP at __," respectively.

to increase to a dose of five or six tablets per day when necessary to control pain. (*Id.* 80-81.) She took such a heightened dose around April 5, 2004, and soon thereafter developed a fever, altered mental status, and leukopenia.[2] (*Id.* at 215.)

After a weeklong hospitalization, Mrs. Bryner died on April 15, 2004. (*Id.*) As her condition deteriorated, her physicians noted that she was experiencing multiple organ system failure, anoxic brain injury, and no cranial nerve reflexes. (*Id.*) Although Mrs. Bryner's original death certificate identified the cause of death as "overwhelming sepsis," the death certificate was revised to indicate a "possible colchicine overdose." (*Id.* at 90.)

In December 2004, after considering the medical evidence, Bryner filed a claim for benefits under the terms of the Plan. (*Id.* at 79-80.) He based his claim on evidence that Mrs. Bryner's "death was due to accidental colchicine poisoning following a severe gout attack." (*Id.* at 79.) Prudential denied the claim initially and on reconsideration, noting that the hospital records failed to indicate a colchicine overdose. (*Id.* at 202-05, 277-79.)

In his appeal to Prudential, Bryner included additional evidence of colchicine poisoning, relying principally on the medical opinion of Jack Daniel, M.D. ("Dr. Daniel"), a pathologist. Based on his review of the medical records and experience as a former medical examiner, Dr. Daniel concluded "to a reasonable degree of medical certainty that the findings are entirely consistent with the underlying and proximate cause of Mrs. Bryner's death having been acute colchicine toxicity." (PRU at 175.) Prudential

---

[2] Leukopenia is a reduction in the number of white blood cells in the bloodstream. *Dorland's Illustrated Medical Dictionary* 1028, 1030 (32d ed. 2012).

3

submitted Dr. Daniel's findings and the other medical evidence to its own Medical Director, Joyce Bachman, M.D. ("Dr. Bachman"). While acknowledging that "colchicine toxicity is consistent with the clinical picture" illustrated in Mrs. Bryner's records, she concluded that death resulted from "a combination of factors." (*Id.* at 97.) Relying on this conclusion, Prudential again denied the claim. (*Id.* at 203-04.)

Bryner then appealed Prudential's decision to DuPont, which retains authority to overrule any decision made by Prudential. (DUP at 176.) Based on the same record submitted to Prudential, an independent panel at DuPont upheld denial of the claim. Rejecting Bryner's assertion that colchicine toxicity was "the sole cause of death," DuPont applied the exclusion for "sickness, disease or bodily infirmity except when as a direct result of a covered accident." (*Id.* at 6.) In effect, DuPont relied on the existence of *multiple* causes of death to reject any contention that Mrs. Bryner's death was "a direct result of a covered accident." (*Id.*) Notably, DuPont did not indicate whether it would have denied benefits had it concluded that colchicine toxicity was, in fact, a direct cause of death.

On April 15, 2009, Bryner filed his first lawsuit in this Court challenging the decisions of Prudential and DuPont. Pursuant to a settlement agreement reached in that case, DuPont agreed to reconsider Bryner's claim *de novo*, including consideration of the opinion of Brandon Wills, D.O. ("Dr. Wills").[3] Bryner had submitted his wife's medical

---

[3] DuPont mischaracterizes its consideration of Dr. Wills' report as benevolence, since it was not required to consider new evidence during judicial review and it had properly objected to it during the first lawsuit. (Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mem.") at 11 (citing *Sheppard & Enoch, Pratt Hosp. v. Travelers Ins. Co.*, 32

records to Dr. Wills soon after DuPont denied his appeal. In his report, Dr. Wills criticized several aspects of Dr. Bachman's findings and disagreed with her conclusion. (*Id.* at 323-24.) From his review of the medical evidence, Dr. Wills concluded that colchicine alone was the cause of Mrs. Bryner's death. (*Id.* at 323.)

In considering Dr. Wills' opinion and Bryner's final submission, DuPont obtained an independent evaluation from Vincent J. Zarro, Ph.D., M.D. ("Dr. Zarro"). Dr. Zarro agreed with Dr. Daniels' findings, concluding that Mrs. Bryner's death was triggered solely by a toxic dosage of colchicine. (*Id.* at 229.) And while Dr. Zarro indicates that the dosage taken is no longer recommended in any medical literature, he acknowledges that such dosage was considered appropriate during the relevant time frame. (*Id.*) Despite these findings, DuPont again denied the claim, concluding that death due to a prescribed course of medical treatment does not fall within the definition of a "covered accident." In its final analysis, DuPont based its decision on the fact that Mrs. Bryner's death "was the direct result of a deliberate action rather than a covered accident." (*Id.* at 203.) Noting that the term "'[a]ccident' is not defined in the Plan," DuPont concluded that "whether or not an 'accident' occurs depends on objective actions, not on the

---

F.3d 120 (4th Cir. 2010)).) This is not a fair portrayal of the procedural history, because DuPont agreed to consider such evidence as part of a bargained-for settlement of the previous lawsuit. *Bryner v. Prudential Ins. Co. of Am.*, No. 3:09cv230, ECF No. 24 (Mar. 15, 2010). In return for considering new evidence, DuPont received: (1) dismissal with prejudice for its co-defendant, Prudential; (2) a series of deadlines imposed upon Bryner which, if missed, would result in dismissal with prejudice of all claims; and, (3) the discretion to consider any other additional evidence that it deemed just and proper. Thus, DuPont considered Dr. Wills' opinion in return for a contractual benefit, not out of altruistic motives.

subjective expectations of the insured." (*Id.*) This definition, however, is neither based on the text of the Plan, lexicography, nor clearly established law.

DuPont confirmed this final decision on administrative appeal and this lawsuit followed.

The parties have filed cross-motions for summary judgment raising disputes over the governing standard of review applicable to DuPont's decision, as well of its merits. The Court heard oral argument after considering the written submissions and subsequently ordered supplemental briefing on the Fifth Circuit's recent decision in *Firman v. Life Ins. Co. of N. Am.*, 584 F.3d 533 (5th Cir. June 15, 2012). In short, the issue presented is whether DuPont abused its discretion in determining that Mrs. Bryner's death was not a "covered accident" under the Plan.

## II. STANDARD OF REVIEW

Several basic principles of trust law govern judicial review of challenges to a plan administrator's denial of benefits governed by ERISA. Courts must "review a denial of plan benefits under a *de novo* standard unless the plan provides to the contrary." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008). If the plan vests in the plan administrator the "discretionary authority to make eligibility determinations," a reviewing court evaluates that decision for abuse of discretion.[4] *Williams v. Metro. Life Ins. Co.*,

---

[4] Citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989), DuPont argues for the application of an "arbitrary and capricious" standard of review, as opposed to the "abuse of discretion" standard. (Def.'s Mem. at 16.) *Firestone* contains no holding to support this proposition. Since *Firestone*, the Fourth Circuit has rejected the "more deferential" arbitrary and capricious standard in favor of the abuse of discretion standard. *Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335,

609 F.3d 622, 629-30 (4th Cir. 2010) (citation omitted). Applying this standard, a court may "not disturb a plan administrator's decision if the decision is reasonable," even if the court would have reached a different decision on its own. *Id.* at 630 (citation omitted). In other words, the court cannot substitute its judgment for that of the plan administrator. *Id.* (citing *Berry v. Ciba-Geigy Corp.*, 761 F.2d 1003, 1008 (4th Cir. 1985)). The administrator's decision is reasonable if it results from a "deliberate, principled reasoning process and [is] supported by substantial evidence." *Id.* (citations and internal quotation marks omitted).[5]

The Fourth Circuit has set forth eight non-exclusive factors that guide the abuse of discretion analysis. These are: (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decision-making process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion;

---

342-43 (4th Cir. 2000). Thus, DuPont's decision will be reviewed for an abuse of discretion.

[5] According to Bryner, DuPont is not entitled to deference in this case, because the term "accident" is not defined in the Plan and DuPont has a conflict of interest. (Pl.'s Mem. Supp. Mot. Summ. J. at 13-14.) Neither argument supports application of a different standard of review. First, the most recent statement of the law in the Fourth Circuit clearly establishes that, where the plan grants discretionary authority to the plan administrator, the Court must apply an "abuse of discretion" standard. *DuPerry v. Life Ins. Co. of N. Am.*, 632 F.3d 860, 869-70 (4th Cir. 2011). And where a conflict of interest can be shown, that is but one factor in the analysis—it does not change the standard of review. *Id.* Even so, Bryner has not shown that DuPont operated under a conflict of interest, because it was not the party responsible for paying benefits.

and, (8) the fiduciary's motives and any conflict of interest it may have.[6] *Id.* at 630 (citing *Booth*, 201 F.3d at 342-43).

## III. DISCUSSION

Throughout the process of challenging DuPont's denial of benefits, Bryner has expended considerable time and resources addressing DuPont's original diagnostic basis for denial—that Mrs. Bryner died from multiple causes. Now, approximately eight years since his initial application for benefits, DuPont concedes that colchicine toxicity alone caused Mrs. Bryner's death. Nevertheless, DuPont, relying on a slightly nuanced explanation, remains steadfast in its denial of benefits.

Analyzing DuPont's decision through the lens of the eight nonexclusive factors articulated in *Booth*, 201 F.3d at 342-43 and, more recently reaffirmed in *Williams*, 609 F.3d at 630, the Court concludes that DuPont abused its discretion in denying Bryner's claim. The factors relevant here are: (1) the language of the plan; (2) the purposes and goals of the plan; (3) whether DuPont's interpretation was consistent with other provisions in the plan and with earlier interpretations; (4) whether the decision was consistent with the procedural requirements of ERISA; (5) whether the decision-making process was reasoned and principled; and, (6) consideration of certain external standards

---

[6] Before the Supreme Court's decision in *Glenn*, 554 U.S. 105, the Fourth Circuit applied a "modified abuse-of-discretion" standard whenever a plan administrator operated under a conflict of interest. *See Williams*, 609 F.3d at 630. As the Fourth Circuit now acknowledges, the standard of review does not change when a conflict of interest is present. *Id.* at 631 (citing *Champion v. Black & Decker (U.S.), Inc.*, 550 F.3d 353, 359 (4th Cir. 2008)). Instead, the impact of any conflict of interest is but one of the several non-exclusive factors to be considered. *Id.* (citation omitted).

relevant to interpretations of the word "accident." *See Booth*, 201 F.3d at 342-43. The other two *Booth* factors are not particularly relevant here.[7]

First and foremost, DuPont fundamentally abused its discretion in this case when it based its decision on a self-crafted extra-textual definition of the word "accident" without adequate explanation. *Cf. Andes v. Versant Corp.*, 788 F.2d 1033, 1035 (4th Cir. 1986) (finding an abuse of discretion where the district court "failed to articulate its reason[ing] so that we might give effective appellate review."). In fact, neither DuPont nor Prudential has revealed its definition of "accident," much less its genesis. Instead, each has merely stated that the phrase is ambiguous and undefined; that DuPont retains exclusive discretion to define the phrase; that the phrase does not include a death resulting from multiple causes where some are not covered; and, most recently, that "covered accident" does not include death preceded by an intentional act.

Holding its cards closely, DuPont has not explained what *is* an accident, only what *is not* an accident. DuPont was then able to offer some justification for denial of coverage even when confronted with persuasive proof that the original basis for denial was inaccurate.

---

[7] Factors of minimal consequence here are: (1) the adequacy of the materials considered, and (2) DuPont's motives or any conflict of interest. First, the materials considered are well-developed after extensive expert review and consideration of multiple expert opinions. As to the decision-making process, the process was reasoned and principled in the sense that it was based, at least in part, on a thorough consideration of the record. As for any conflict of interest, Bryner's emphasis on this point is misplaced, because the final decision was DuPont's, but Prudential is responsible for paying the claim. Thus, the Court finds these factors inconsequential to the analysis.

In each variation of their previous explanations, DuPont and Prudential specifically found that colchicine toxicity was not the sole cause of death, and based their decision on this then-disputed fact. For example, and consistent with each previous decision, Prudential's November 30, 2005 denial explained:

> While colchicines toxicity is consistent with the clinical picture seen in Mrs. Bryner, there is ample evidence that *this is not the sole cause* of her Loss given her history of prior hospitalizations similar in presentation without the factor of possible colchicines toxicity. *As a result*, the Loss does not meet the Group Policy's requirements for Accidental Death Benefits to be payable.

(PRU at 203 (emphasis added).) In its final decision on June 25, 2011, DuPont offered a distinct reason for denying coverage: "[Mrs. Bryner's] actions were not accidental. Nor was it an 'accident' that she ingested colchicine in these amounts; rather, she followed her doctor's 'long-standing orders.'" (DUP at 203.) DuPont had known for eight years that Bryner's claim was based on Mrs. Bryner's prescribed ingestion of medically-acceptable quantities of colchicine. At that point, *after* finally conceding that colchicine was the sole cause of death, DuPont offered this terse reason for denying coverage. This last minute change in reasoning is unsettling. *Williams*, 609 F.3d at 630; *see also Mills v. Union Sec. Ins. Co.*, 832 F. Supp. 2d 587, 601 (E.D.N.C. 2011) (finding that inconsistent interpretations and subsequent interpretations that are inconsistent with previous factual findings suggest an abuse of discretion).

To employ diverse applications of the word "accident" would appear to be inconsistent with the Plan goals, namely "to provide employees the opportunity to purchase *accidental* death and dismemberment insurance." (DUP at 188 (emphasis

added).) While ambiguous terms are subject to DuPont's discretionary interpretation, the goal of providing accidental death benefits requires a certain level of predictability which cannot be obtained with amorphous terms of coverage. *Williams*, 609 F.3d at 630 (directing courts to consider "the purposes and goals of the plan") (citation omitted). Otherwise, prospective policy purchasers cannot make an informed decision on the coverage it provides.

For similar reasons, allowing DuPont to change its definition of core terms at will undermines ERISA's goal of "careful[ly] balancing between ensuring fair and prompt enforcement of rights under a plan and the encouragement of the creation of such plans." *Conkright v. Frommert*, __ U.S. __, 130 S. Ct. 1640, 1649 (2010) (citation and internal quotation marks omitted). Concerns with the decisional process were compounded by DuPont's failure to follow the agreed upon deadlines, which required a decision within sixty days, thereby extending the appeals process by almost another year after it had already taken about seven years. *See* 29 C.F.R. § 2560.503-1(i)(1)(i) (requiring notification of a decision within a "reasonable period of time"). Each of DuPont's and Prudential's previous decisions led Bryner to believe that the claim would have been approved if colchicine toxicity was the sole cause of death. This caused Bryner to incur considerable expense to address this issue only to later learn that the ultimate basis for DuPont's decision was a fact known eight years previously—that Mrs. Bryner took colchicine as directed by her physician.

DuPont's adopted interpretation of the term "covered accident" is also inconsistent with other provisions of the Plan language. In particular, DuPont appears to characterize

the consequences of medical treatment as per se non-accidental by invoking the Plan's exclusion for death from "[s]ickness, disease or bodily infirmity *except when as a direct result of a covered accident.*" (DUP at 192 (emphasis added); *see also* Def.'s Mem. at 23-24.) DuPont's logic is strained.

The issue remains the same regardless of whether medical treatment is involved—if the accidental event *directly* caused the sickness or bodily infirmity, then the death may still be covered. By its plain terms, this exclusion specifically contemplates coverage for death from sickness when a "covered accident" is causally linked to the sickness. There is nothing about this language or any other Plan provision which renders medical treatment unique. And as the Fourth Circuit has recognized, "'an accident is an unintended occurrence. If such happens during medical treatment, it is still an accident.'" *Griffiths v. Siemens Automotive, L.P.*, No. 92-2118, 1994 U.S. App. LEXIS 32311, at *5 (4th Cir. Nov. 16, 1994) (quoting *Whetsell v. The Mut. Life Ins. Co. of New York*, 669 F.2d 955, 957 (4th Cir. 1982)).

DuPont's reliance on the Seventh Circuit decision in *Senkier v. Hartford Life & Accident Ins. Co.*, 948 F.2d 1050 (7th Cir. 1991), is misplaced. Citing the rule that "where the courts of appeals are in disagreement on an issue, a decision one way or another cannot be regarded as arbitrary or capricious," DuPont suggests that it may rely on *Senkier* to define "accident" in such a way as to exclude a medical mishap. *Hinkle v. Assurant, Inc.*, 390 Fed. App'x 105, 108 (3d Cir. 2010) (citation omitted). First, as the Court has already explained, the "arbitrary and capricious" standard of review is not applicable in the Fourth Circuit. *Supra* note 4 (citing *Booth*, 201 F.3d at 342-43). More

importantly, a number of courts have explicitly rejected *Senkier*'s analysis—including the Fourth Circuit. *Griffiths*, 1994 U.S. App. LEXIS 32311, at *5 (quoting *Whetsell*, 669 F.2d at 957). Even if DuPont could rely on *Senkier*, the absence of an articulated definition of "accident" is a glaring void which distinguishes the immediate case from *Senkier*.

To the extent that the Court can discern DuPont's concept of "accident" from its decisions, its apparent definition still appears to be unreasonable, because it fails to account for the reasonable expectations of the insured. Struggling to define the word "accident," a number of Courts have turned to the doctrine found in *Wickman v. Northwestern Nat'l Life Ins. Co.*, 908 F.2d 1077 (1st Cir. 1990). In that case, the decedent intentionally climbed over a railing on a bridge, then fell. While it was clear that his act of climbing over the railing was intentional, it was unclear whether he intended to fall to his death. In its analysis, the First Circuit developed a two-part test. First, a fact-finder must determine whether the insured subjectively expected death or serious injury, and if so, were "the suppositions which underlay that expectation" reasonable. *Id.* at 1088. Second, if the fact-finder cannot determine the subjective expectations of the insured, it must undergo an objective analysis—would a reasonable person with similar background and characteristics have expected serious injury or death? *Id.* Under the facts of *Wickman*, the Court found that the death was not accidental because the decedent either intended to jump off of the bridge or, alternatively, it was

unreasonable for him to place himself in such a risky situation and expect to survive. *Id.* at 1088-89.[8]

The Fourth Circuit has applied the *Wickman* framework to determine whether an occurrence is an "accident," including in cases where the plan administrator is vested with discretion. *Eckelberry*, 469 F.3d at 343 (applying *Wickman* doctrine where plan administrator was entitled to deferential abuse of discretion standard); *Baker*, 171 F.3d at 942-43 (suggesting that the Fourth Circuit would apply *Wickman*). In an unequivocal endorsement of the *Wickman* doctrine, the Fifth Circuit recently held:

> [T]he common law definition of 'accident' adopted in *Todd v. AIG Life Ins. Co.*, 47 F.3d 1448, 1456 (5th Cir. 1995) [applying *Wickman*], is controlling in all ERISA accidental death and dismemberment plans where the term 'accident' is undefined, *irrespective of whether the plan administrator is given discretion to interpret the plan.*

---

[8] DuPont argues that the *Wickman* doctrine applies only in cases involving dangerous activity. (Def.'s Suppl. Mem. Supp. Def.'s Mot. Summ. J. at 1.) The Court has reviewed numerous cases applying the *Wickman* doctrine, each of which contained facts involving dangerous activity. *Firman*, 684 F.3d 533 (drunk driving); *Stamp v. Metro. Life Ins. Co.*, 531 F.3d 84 (1st Cir. 2008) (same); *Eckelberry v. ReliaStar Life Ins. Co.*, 469 F.3d 340 (4th Cir. 2006) (same); *Baker v. Provident Life & Accident Ins. Co.*, 171 F.3d 939 (4th Cir. 1999) (same); *Cozzie v. Metro. Life Ins. Co.*, 140 F.3d 1104, 1109-10 (7th Cir. 1998); *Todd v. AIG Life Ins. Co.*, 47 F.3d 1448 (5th Cir. 1995) (autoerotic asphyxiation); *Wickman*, 908 F.2d 1077 (standing on edge of bridge); *Weatherall v. ReliaStar Life Ins. Co.*, 398 F. Supp. 2d 918 (W.D. Wisc. 2005) (drunk driving); *Sorrells v. Sun Life Assurance Co.*, 85 F. Supp. 2d 1221 (S.D. Ala. 2000) (same); *Walker v. Metro. Life Ins. Co.*, 24 F. Supp. 2d 775 (E.D. Mich. 1997) (same); *Schultz v. Metro. Life Ins. Co.*, 994 F. Supp. 1419 (M.D. Fla. 1997); *Miller v. Auto-Alliance Int'l, Inc.*, 953 F. Supp. 172 (E.D. Mich. 1997) (same); *Cates v. Metro. Life Ins. Co.*, 14 F. Supp. 2d 1024 (E.D. Tenn. 1996) (same); *Fowler v. Metro. Life Ins. Co.*, 938 F. Supp. 476 (W.D. Tenn. 1996) (same). Other than the presence of arguably dangerous activity in the facts, there is no language in any one of these cases to suggest that the *Wickman* doctrine should not guide other circumstances where the definition of "accident" is at issue. Indeed, it would defy logic to consider the insured's expectations when engaged in negligent conduct, while completely discounting the reasonable expectations of an insured relying on doctor's orders—such as Mrs. Bryner here.

*Firman v. Life Ins. Co. of N. Am.*, 684 F.3d 533, 534 (5th Cir. June 15, 2012) (emphasis added).

Applying *Wickman* to this case, particularly in light of *Firman*, DuPont clearly abused its discretion when it failed to consider Mrs. Bryner's reasonable expectations. Just as in *Firman*, the Plan here does not define the term "accident," but grants interpretive discretion to DuPont as plan administrator. The record here contains scant evidence of Mrs. Bryner's subjective expectations concerning the risks of colchicine treatment. But, there can be no doubt from the record that "a reasonable person" in her situation would not have viewed death as "highly likely to occur as a result of" a prescribed treatment for non-fatal gout. *Wickman*, 908 F.2d at 1088 (citing *City of Carter Lake v. Aetna Cas. & Sur. Co.*, 604 F.2d 1052, 1058-59 & n.4 (8th Cir. 1979)). There is nothing in the record supporting a reasonable inference that she had reason to believe that colchicine treatment could kill her. (PRU at 80-81.) Based on her reasonable expectations, the teachings of *Wickman* compel the conclusion that Mrs. Bryner's death was an accident.

In the final analysis, the wisdom of Justice Cardozo of the United States Supreme Court is instructive. "Probably it is true to say that in the strictest sense and dealing with the region of physical nature there is no such thing as an accident. On the other hand, the average man is convinced that there is, and so certainly is the man who takes out a policy of accident insurance." *Landress v. Phoenix Mut. Life Ins. Co.*, 291 U.S. 491 (1934) (Cardozo, J., dissenting) (citations and internal quotation marks omitted).

While DuPont fails to articulate a specific definition, it hints that "accident" under its Plan involves "objective actions" and not "subjective expectations." (DUP at 203.) This statement highlights the fallacy underlying DuPont's self-crafted standard. Absent some definitional clarity of DuPont's use of the term "objective," its precise application in this context is difficult to comprehend. Must the action be objectively reasonable? Objectively intended? Must the actor be objectively aware of the consequences? Though unclear, DuPont appears to suggest that an intentional action is never accidental, even if the consequences are unintended. But this would mean that choking to death on a chicken bone is not accidental, because the victim intentionally consumed the chicken. Or, someone who falls off of a ladder did not die accidentally, since he intentionally climbed the ladder. Such a definition strains the common understanding of the word "accident."

## IV. CONCLUSION

In short, DuPont's decision is unreasonable because it fails to define the term accident—it merely tells Bryner that his wife's death was not within that definition, whatever it may be. Moreover, it defies logic that an occurrence cannot be an "accident" simply because of its association with an intended act that yielded an unintended consequence. This Court is mindful that the governing standard of review is narrow and that it should not interpose its judgment for that of the Plan Administrator. But here, the construction of the word "accident," adopted apparently for this specific case, lacks principled reasoning.

16

Accordingly, the Court finds that DuPont abused its discretion when it denied Bryner's claim. Bryner's Motion for Summary Judgment will be granted and DuPont's Motion for Summary Judgment will be denied.

An appropriate Order will accompany this Memorandum Opinion.

/s/
Henry E. Hudson
United States District Judge

Date: Dec. 27, 2012
Richmond, Virginia